# CHARLESTON.

GRIFFITH *et al v.* BLACKWATER BOOM & LUMBER Co. *et al*

THOMPSON *v.* BLACKWATER BOOM & LUMBER Co.

Submitted June 11, 1902. Decided April 1, 1904.

1. EXECUTORY CONTRACT—*Corporations.*

When an executory contract with a corporation, necessitating in its execution, work, labor, and the expenditure of money for materials, machinery, tools and appliances, and the construction of roads, and other improvements. as well as in carrying on the work, is terminated by dissolution of the corporation in consequence of its insolvency, the contractor is entitled to compensation for services rendered by him in pursuance of the contract until the date of its termination, and to reimbursement for his actual and necessary outlay and expenses as aforesaid, subject to a deduction of all sums paid to him by the corporation and of the value of such materials, machinery and other property on hand. (p. 613).

2. CONTRACT—*Creditors.*

When such a contract between a corporation and one of its directors has been entered into openly and without fraud, and the disinterested directors and stockholders are fully informed of its terms and permit it to be partly executed without disapproval or notice of an intention on their part to annul it, the

same rule of compesation and reimbursement to the contractor applies upon the subsequent abrogation of the contract by a court of equity at the instance of the stockholders and creditors of the corporation.  (p. 617).

3.  CORPORATION—*Contract—Decree.*

When, in such case, large expenditures have been made by the contractor in the construction and repair of river dams, bridges and roads belonging to the corporation, for the driving and hauling of timber, and upon timber partially prepared for delivery under the contract, and a sale of the corporate property, free and discharged from the contract is made under a decree of the court, directing it to be offered for sale both subject to, and free from, the contract, the contractor is entitled to compensation and reimbursement as aforesaid out of the assets of the company, although he afterwards purchases the corporate property and obtains the benefit of such improvements.. (p. 625).

4.  CONTRACT—*Damage.*

When a contract is broken, it is the duty of the injured party to minimize the loss and injury, when it is practicable to do so by a reasonable outlay of money, but such outlay is to be allowed him as part of his damages.  (p. 625).

5.  CONTRACTOR—*Executory Contract.*

When a contractor, by reason of the termination of a partly executed contract, is entitled to compensation for services and outlay, part of which have been made in effecting permanent improvements, the services and expenditures relating to such improvements are not apportioned between the executed, and unexecuted, parts of the contract.  (p. 627).

6.  CONTRACT.

When in the prosecution of work under his contract for cutting logs and hauling and driving them to a mill, by means of a railroad, tram-roads and booms and dams in a river, constructed by him for the purpose, the contractor puts in timber to the same mill, by means of the same improvements, for others, not keeping separate accounts of the expenditures, it is not error to allow him, upon an inquiry as to the amount necessary to compensate him for his services and outlay, when he has been prevented from completing his contract, to charge up his entire outlay on all work done and credit all sums received on account thereof, when it is shown that all the work was profitable so far as executed, and that the accounts cannot be separated.  (p.. 633).

Appeal from Circuit Court, Tucker County.

Action by Catharine R. Griffith and others against the Black-water Boom & Lumber Company and others, and by Albert Thompson against the same defendants. Judgment for defend-ants, and plaintiffs appeal.

*Modified.*

C. W. DAILEY, TAYLOR MORRISON, and MR. RICHMOND, for appellants.

HUBBARD & HUBBARD, A. G. DAYTON, IRA E. ROBINSON, and WM. C. CLAYTON, for appellees.

POFFENBARGER, PRESIDENT:

This is a somewhat complicated and a hotly contested case which has been in this Court on a former appeal. As then passed upon it is reported in 46 W. Va. 56, where the nature of the controversy and the history of the transactions out of which it arose are substantially set forth. It was impossible there, as it is here, to give in detail, or even enumerate, all that is contained in the old record of more than seven hundred pages, to which nearly three hundred pages have since been added.

After the case was remanded to the circuit court for further proceedings according to the principles announced by this Court upon the former appeal, it was referred to a commissioner with directions to report, first, what would be a just and reasonable compensation to Albert Thompson for labor and money necessarily expended in part performance of his contract; second, upon the request of any interested party, to make a statement of such expenditures under the contract until the entry of the decree of August 4, 1893, showing allowances to him for his time, labor and all sums paid by him for the time and labor of others, and expended by him in equipment and material necessary to carry out such contracts, all sums paid for cutting, hauling, skidding and driving logs, timber and tan bark, all reasonable sums paid sub-contractors by reason of the obligation of their contract and all other items reasonably and necessarily paid by him in part performance of the contract, allowing him interest upon the sums so expended, and crediting said account with all sums paid to him by said company or its receiver or realized from the sale of any materials or equipments; and, third, the amount due Thompson for work and

labor performed and money expended in the prosecution of the contract under the direction of the receiver until June 23, 1893, when the work was suspended by order of the court; and the amount due him for expenditures, work, and labor from the 23d day of June, 1893, until the 4th day of August, 1893, when the sale of the property of the Blackwater Boöm and Lumber Company was confirmed.

The commissioner reported that there was due Thompson as of the 12th day of June, 1901, $85,642.02, returning with his report a full statement of all sums paid out and expended by Thompson in the prosecution of said work and all sums paid to him on account thereof as well as the proceeds of the sales of property used by him in the performance of said work as equipments, such as horses, wagons, locomotives, cars, steel rails, etc. Upon exceptions sustained by the court the amount so found was reduced to $84,794.91 and a decree entered therefor. Of this amount, about $480,000.00 is principal and the balance interest. Numerous exceptions to the report, urged in the court below and overruled, are insisted upon here, and there is much difference of opinion as to the true interpretation of the former decision of this Court. For the appellants, it is insisted that, under the principles so announced, the item of $14,749.34, mentioned in the opinion at page 65 of 46 W. Va., which, without interest, was originally $12,399.63, for work done on logs cut by Thompson, but not delivered so as to entitle him to demand payment therefor at the time the decree of sale was entered, is the only sum that can now be allowed him.

Counsel for the appellee say this Court regarded and treated the contract as having been rescinded and declared it to be so and ordered that Thompson be put in *statu quo*,—reimbursed for all his outlay and made whole. The Court say, in the opinion, "A partly executed executory contract could be avoided before its final execution, but the executing party thereto should be placed in *statu quo,* in absence of fraud, by compensation in the nature of a *quantum meruit* for money and labor expended under such contract." In conclusion the Court said: "Having partly executed his contracts, Albert Thompson is entitled to recover a just and reasonable compensation for the necessary expenditure of labor and money under his stocking contract, less the sums paid him; but he is not entitled to recover the large profits claimed by him. As the sum of fourteen thousand seven

hundred and forty-nine dollars and thirty-four cents is an. *alleged part* of such expenditure, it should not have been credited until the true amount thereof had been ascertained and .deter-- mined. This amount, when ascertained and determined, by reason of the adoption of the stocking contract by the receiver,. under the direction of the court, and thereby preventing Albert Thompson from perfecting his statutory lien therefor, under section 8, chapter 75, Code, will be a prior lien on the assets of the corporation in the hands of the receiver." The substance of this conclusion is incorporated in points 3 and 4 of the sylla-bus. In the opinion of the Court, the contract was voidable on the part of the Blackwater Boom & Lumber Company, and the court, having succeeded to its rights in the administration of its affairs, abrogated it, by selling the property of said company free from the obligation of Thompson's contract, but it held,. nevertheless, as stated, that he is entitled to compensation and the only question to determine is the amount thereof.

The termination of Thompson's contract, as decided on the former appeal, rests upon two grounds. The first is that the corporation was unable, because of financial embarrassment, to further proceed with its business, and the other that, as Thompson was a director of the company, at the time the contract was entered into, it was voidable at the election of the stockholders. It is not therefore the ordinary case of a wrongful prevention of the performance of a contract, nor is it a case of settlement of the equities or legal rights of the parties, upon the rescis-sion of a contract.

The principle of law underlying the first ground upon which the contract was declared to have terminated, is announced in *People* v. *Globe Mutual Life Ins. Co.,* 91 N. Y. 174. 1 Am. & Eng.. Cor. Cas. 586. This doctrine is that where performance of a contract by a corporation is prevented by its dissolution at the instance of the State or power creating it, it may annul its con-tracts, and, in doing so, does not commit any breach of the con-tract. The act of annulment is deemed to be that of the State and not of the corporation, and gives the contractor no right to claim damages as for a breach of his contract. Whether, in such case, the contractor is entitled to be reimbursed for his outlay and expenses is not determined in that case for the reason that no such question was involved. The demand set up and denied was founded upon a contract of employment as agent

and the damages claimed were for anticipated profits. Such termination of the contract does not imply that it was not a valid contract, imposing obligations and conferring rights up until the moment of the dissolution. The conract in such case cannot be considered to have been void *ab initio*. A long list of cases turning upon this principle will be found in the note to the case above cited, as reported in 1 Am. & Eng. Cor. Cas., holding that the parties to an entire contract of such a nature as indicates that they, in entering into it, must have contemplated the possibility of its termination by act of the law or of God or by some cause beyond their power, are, upon the happening of such event, relieved from its obligations, so far as it remains unexecuted, upon the theory that though, in form, it was an entire and indivisible contract, yet as the parties must have had in view the contingency which rendered it impossible of further execution, or gave right to terminate it, it was in fact and in law a divisible contract contrary to its form, and recovery is allowed for such part of the contract as has been performed, but profits which would have arisen from further and future performance are denied and refused. *Mumma* v. *Potomac Co.*, 8 Pet. 286; *Fenton* v. *Clark*, 11 Vt. 557; *Fuller* v. *Brown*, 11 Mete. 440; *Ryan* v. *Dayton*, 25 Conn. 188; *West* v. *Boylston*, 4 Pick. 101; *Ferrington* v. *Ryan*, 7 R. I. 589; *Stewart* v. *Loring*, 5 Allen 306; *Knight* v. *Bean*, 22 Me. 531; *Merrill* v. *Suffolk Bk.*, 31 Me. 57; *Read* v. *Frankfort Bk.*, 23 Me. 321; *Furrows* v. *Wilson*, L. R., 4 C. P. 744; *Tasker* v. *Shepherd*, 6 H. & N. (Exch.) 575; *Chamley* v. *Winstanley*, 6 East, 266; *Taylor* v. *Caldwell*, 3 B. & S. 826; *Rhodes* v. *Forwood*, L. R., 1 App. Case. 256; *Thurnell* v. *Balbernie*, 2 M. & W. 786; *Brogdon* v. *Manott*, 2 Scott, 703; *Worsley* v. *Wood*, 6 T. R. 710; *Davison* v. *Moore*, 3 Douglass 28; *Milner* v. *Field*, 5 Exch. 829; *Morgan* v. *Birnie*, 9 Bing. 672; *People* v. *Manning*, 8 Cow, 297; *Carpenter* v. *Stevens*, 12 Wend. 589; *Wolf* v. *Howes*, 24 Barb. 174; *Fahy* v. *Worth*, 19 Barb. 341; *Spaulding* v. *Rosa*, 71 N. Y. 40; *Sturges* v. *Vanderbilt*, 73 N. Y. 390; *Smith* v. *Brady*, 17 N. Y. 173; *Walker* v. *Tucker*, 70 Ill. 527; *Orr* v. *Ward*, 73 Ill. 317; *Hercules Ins. Co.* v. *Brinker*, 77 N. Y. 435. By far the greater number of these cases involve contracts for compensation to agents and servants in which no demand for money laid out and expended in preparation for, and execution of, the contract was

made or could have been set up. Hence, in none of them is that question passed upon. The doctrine of the case of *People v. Globe Mutual Life Ins. Co.*, above cited, is examined and repudiated as unsound and at variance with the principles of law in *Rosenbaum* v. *United States Credit System Co.*, 61 N. J. L. 543. Speaking for the court, Chancellor McGill said: "It appears to us that the material fact that the corporation defendant is a stock company, and that its capital stands as a trust fund for the payment of its debts, is lost sight of. Such a company may become insolvent, and its charter may be forfeited when its assets may be more than sufficient to pay its debts. Every one who deals with such a corporation does so in view of the trust fund its capital provides, and the security that fund is intended to afford. The stockholders who provide the fund invite confidence because of it, that through such confidence their venture may be profitable to them. The mere statement of this situation makes conspicuous the injustice of any course of reasoning which will return to the stockholders their capital before satisfaction of all losses induced by faith in it shall be made. The state creates corporations and requires of them the provision of such a trust fund, and when it destroys their corporate existence, natural justice requires that it shall provide for distribution of the fund so that no part of it shall be returned to those who offer it as security for the action of others, until the latter shall have all the protection against loss in their undertaking that it is capable of affording."

Other cases more analogous to the one now under consideration, hold that the effect of the dissolution of a corporation upon unexpired or executory contracts is to excuse further performance and render them nugatory as to so much as remains unperformed, but to entitle the obligee to damages for the breach of the contract to be paid out of the assets of the dissolved corporation. 10 Cyc. 1312. Thus, in *Schleider* v. *Deilman*, 44 La. Ann. 463, the court held the dissolution of the corporation to be a breach of the contract, giving the other party the right to recover what he has already expended toward the performance of it and the profits which he would have realized by performance. *In re Willshire Iron Co.*, L. R. 3 Ch. 443, holds that where a sale of personal property has been made by a corporation which is dissolved before delivery of the property, the purchaser

has a valid claim for damages for the breach of the contract payable out of the assets of the company. In *Spader* v. *Mfg. Co.,* 47 N. J. Eq. 18, it is held that where a person was employed by a corporation for a term of years for a fixed salary and before the expiration of the term, the corporation became insolvent and a receiver was appointed to wind up its affairs, the employee was entitled to damages for breach of his contract, payable *pro rata* out of the assets in the hands of the receiver.

In treating of this subject, Cook on Corporations, sec. 641, says: "It was formerly believed to be the common law that upon the dissolution of a corporation all its assets belonged to the state, and all its debts were canceled, and that the creditors were not entitled to anything from the assets. This remarkable theory has been stated and restated in text-books and decisions of the courts for over one hundred years. It is found in Blackstone's Commentaries and in the old works of Kyd on Corporations and Grant on Corporations. The courts, however, while upholding the rule theoretically, have quite uniformly refused to *apply* such a doctrine, and have invented various theories, fictions, and arguments for avoiding this supposed doctrine of the common law. Finally, in 1899, an English court denied that the common law ever countenanced such confiscation, and showed that in the seventeenth and eighteenth centuries many corporations were dissolved, and that not in a single case was any such doctrine applied. It again may be said that, although the common law has its reproaches, this is not one of them. The American courts have always refused to follow the supposed common-law rule on this subject." The same work says, at sec. 642; "As already seen, the old rule that upon dissolution all debts by or to the corporation are rendered unenforceable is no longer the law. It has been held that the liability of a corporation to deliver goods, according to an executory contract, ceases upon such corporation passing into the hands of a receiver, where the receivership was accompanied by the usual injunction against the further transaction of business by the insolvent corporation. This conclusion is arrived at on the theory that the failure to perform was due to the operation of law, and hence that no damages could be recovered for breach of the contract. The better rule, however, is that even at common law the obligations of a corporation do not cease by reason of its dissolution. The

dissolution of a company does not put an end to its executory contract to employ a person, nor obligations which were created for a period longer than the duration of the corporate charter. Where a corporation is dissolved before a lease taken by it runs out, the lessor may hold its assets liable for the breach of contract. Where a receiver is appointed he generally finds a number of executory contracts in force—contracts of employment, or for rental of premises, or for purchases of material, etc. He then must decide whether he wishes to adopt any of these contracts as his own. If he does not adopt a particular contract, then that contractor has no preferred claim against the receiver, as a part of the receiver's expenses or disbursements, but has merely a claim against the corporation and its general assets, and this claim may be for past sums due or for breach of contract or both. On the other hand, if the receiver does adopt the contract, then as to sums becoming due before such adoption the contractor is a general creditor only, but as to sums becoming due after such adoption, they are a part of the receiver's expenses or disbursements and must be paid as such. The law is clear that a receiver may refuse to carry out an executory contract of the corporation. A receiver has no power, however, to cancel a lease except as to his own liability."

Upon this question the language of section 59 of chapter 53 of the Code has important bearing. It says the property and assets of a dissolved corporation, whatever the cause or manner of its dissolution may be, shall be subject to the payment of the liabilities of the corporation. This language is much broader than that of the New Jersey statute which only directs the payment of the debts of the corporation out of its assets, and under which the courts of that state give damages on executory contracts rendered impossible of performance by reason of dissolution. As has been stated, the contract is not invalid, everything done under it is in part performance thereof, and the dissolution of the corporation cannot have the effect of rescission or rendering it void *ab initio* and undoing anything that has been performed under it. Dissolution, even upon the theory adopted by those courts which adhere to the doctrine of *People v. Globe Mutual Life Ins. Co.,* is simply a contingency in view of which the contract was made, and which it was understood should, upon its happening, end the contract on a date earlier

than that specified. Under that doctrine, full compensation is paid for so much of the contract as has been performed at the date of the dissolution, and profits which would have arisen from the performance of the part remaining unexecuted are denied and refused. It is difficult to conceive or express any reason why, upon the same principle, money expended in the performance of a contract which is not one of mere agency or service, should not be recovered. It is laid out and expended upon the faith of the contract, at a time when that contract is recognized by the parties as valid and binding. If necessarily expended, as it must be if recoverable in any sense, it is of the very essence of performance, an act of performance, a thing without which there could be no performance. Can the dissolution of the corporation have the effect of undoing that which was binding at the time it was done and of releasing obligations fixed and unalterable by the parties themselves? It cannot be done upon any theory except that which was supposed once to have been a principle of the common law under which the dissolution of a corporation cancelled all its obligations, released it of its debts, vested the title to its personal assets in the king and returned its real estate to the donors, a doctrine which Cook well says has been declared by the English court never to have been a part of the common law and which has never been adopted, approved, and recognized in America. There is certainly no room for any such principle under the statutes of this State creating, regulating and providing for the dissolution of corporations and of the distribution of their assets.

Nor do the principles of law, constituting the other ground for discontinuing the performance of the contract, preclude recovery for outlay and expenses in part performance thereof. In its opinion the Court exonerates Thompson from any actual fraud in the procurement of his contract, although holding that his being a director of the corporation gave the stockholders the right to avoid it, and held that he is entitled to be compensated for labor and money necessarily expended by him in part performance thereof. The rule on this subject is stated in 10 Cyc. 794, 795, as follows: "Directors are not disabled from entering into contracts with the corporation, provided there be enough directors on the other side of the contract to make a quorum, and provided the contract is open, fair, and honest. The rule

under consideration prohibits a director from acquiring secret profits through contracts made with or for the corporation, but does not pohibt contracts with the corporation, where there has been a full and fair disclosure of his interest in the contract. For example it has been held that the shareholders and directors of a manufacturing corporation, who, with their own money and on their own credit and risk, erect new works, may make profit thereon upon the sale to such corporation of such works, and are not accountable therefor, especially where the transaction is advantageous to the corporation, has been ratified by a unanimous vote at a shareholder's meeting, and an opportunity is given the shareholders to rescind, with full knowledge of all the facts; and where opportunity was also given to the corporation to erect such works before their construction was undertaken by the directors. Such contracts will be scrutinized in equity, and will be set aside if not made in the utmost fairness and good faith. So far from being void *ab initio,* such contracts are good as against third persons, who are not in a position to set up the rights of the corporation by way of defense against them. The rule is specially applicable where, although the director received a profit out of the transaction, the contract was made in good faith, was not improvident, had been performed, and the corporation had received the benefit of its performance, under which circumstances it has been held that it could not be undone by a receiver subsequently appointed for the corporation." On the same subject, Clark on Corporations, at section 761c, pp. 2304, 2305, says: "This doctrine is not recognized in all jurisdiction, nor in most jurisdictions. On the contrary, most of the courts have held that a director or other officer of a corporation is not precluded from lending it money and taking a mortgage or other security, selling it property, or purchasing property from it, or otherwise contracting or dealing with it, if for the purpose of the transaction he does not represent the corporation at all, but it is adequately represented by its other directors or officers, and the transaction is entirely free from fraud. And by the weight of authority, a transaction between a director or other officer and the corporation, or a transaction in which a director or other officer is interested, is valid, if entirely free from fraud, even when he has acted as a member of the board in authorizing the same, if there were enough of disin-

terested votes in favor of the transaction to render his vote unnecessary."

Mr. Justice Miller, speaking for the court in *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587, said: "So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more. severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness. All this falls far short, however, of holding that no such contract can be made which will be valid; and we entertain no doubt that the defendant in this case could make a loan of money to the company; and as we have already said that the evidence shows it to have been an honest transaction for the benefit of the corporation and its shareholders, both in the rate of interest and in the security taken, we think it was valid originally, whether liable to be avoided afterwards by the company or not."

In *Leavenworth County* v. *Railway Co.,* 134 U. S. 688, the court refused to set aside the foreclosure of a mortgage on a railroad and the sale of the road made under a decree, on the ground of its having been procured by parties sustaining a trust relation to the property, where there was no proof of collusion or fraud in fact. In *Ft. Wayne Rolling Mill* v. *Hill,* 174 Mass. 224, the court said of a contract made between a corporation and one of its directors: "It was not illegal or void because made with a director, the only person likely to be willing to make it. In this country it very generally has been deemed impracticable to adopt a rule which absolutely prohibits such contracts." The same doctrine is announced in the case of *Gay* v. *Fair,* 175 Mass. 521. In the late case of *Hodge* v. *United States Steel Corporation,* 54 Atl. R. I., the law on this subject is stated by the court of last resort in New Jersey as follows: "The general doctrine

is well established in this state that facts known, which are sufficient to put a party upon inquiry, are sufficient to charge him with all knowledge he would have acquired by a proper inquiry in the ordinary course of business. The rule that directors cannot lawfully enter into a contract in the benefit of which even one of their number participates without the knowledge and consent of the stockholders, is the settled law of this state. Such a contract is voidable at the option of the corporation, but is not void *per se*. When the facts are disclosed to the stockholders, it may be subsequently ratified by them."

As the contract was voidable and not void *per se,* the principle of estoppel, according to the great weight of authority, is applicable to cases of this kind and must be given effect if the facts of this case warrant its application. The principal contract under which Thompson operated bears date June 18, 1890. Under it, he began operations in the same month and continued them until August, 1893, during which time he built a railroad, equipped it with locomotives and cars, built tram-roads, rebuilt and repaired dams in the Blackwater River and carried on the business of stocking the mill with timber under the contract upon an immense scale, using the railroad, cars, locomotives, tram-roads, tools, appliances and the booms and dams in the river for that purpose, and, as indicated by the record, practically supplied the mill with timber. In these operations, he expended nearly three hundred thousand dollars, according to the report of the commissioner. He resigned his position as director in 1891. Can it be possible that the directors and the stockholders who appear to have been few in number, (only six as indicated by the record), had no knowledge of the immense expenditure Thompson was making on the faith of this contract? Whether the making of the contract was in all respects duly formal or not, the books of the company were open to them, and upon them the terms of the contract were indicated by the entries. For a long time after Thompson ceased to be a director and to have any share or part in the management of the company, they allowed him to go on without objection or notice of the disapproval of the contract. If, having such knowledge, they had the right to avoid the contract because he was a director at the time it was made, can they do it in such manner as to inflict upon him the loss of so much of this large expenditure as compliance with his contract, so far as he was

permitted to perform it, necessitated? Having the right to
deprive him of the profits which he could have made on the
contract if permitted to complete it, have they also the right
to punish him by depriving him of money expended under the
honest belief that they, having full knowledge of all the facts,
as they must be deemed to have had, and giving it to creditors,
who advanced their money under the belief that the company
had such financial strength as warranted their doing so without
taking security for its repayment, just as Thompson laid out and
expended these immense sums, under the like belief? The law
does not demand the infliction of any such punishment, nor will
its principles warrant the court in depriving him of compensa-
tion for his expenditures merely because of his fiduciary status
at the time the contract was made, even if this Court has cor-
rectly decided that he is not entitled to damages by way of
compensation for the loss of anticipated profits, as to which
it is now too late to enter upon any inquiry.

"The rule under consideration does not extend so far as to
work an entire confiscation of the property of the unfaithful
director, which he may have attempted to sell to his corporation
at an advance over its cost to him, so as to derive a secret profit
therefrom; but in the accounting which takes place under the
principle the director will be compelled to yield to the corpor-
ation the secret profit, but will be allowed a credit for the prop-
erty sold to the corporation at its real value." 10 Cyc. 795.

"In most jurisdictions, as we have seen, a contract or other
transaction between a corporation and its directors or other
officers, the corporation being represented by others, or a con-
tract or other transaction between a corporation and a third
party, from which a director or other officer derives a profit,
or in which he is otherwise personally interested, is merely
voidable at he option of the corporation, and not absolutely
void. It follows that the transaction, if within the powers of
the corporation, may be consented to, ratified, or acquiesced in
by the stockholders, or by the board of directors, if it could be
authorized by them. If it is consented to or ratified, with full
knowledge of the facts, it is finally and absolutely binding, and
neither the corporation nor the individual stockholders can
afterwards sue to set it aside, or otherwise attack its validity.
And since the corporation may thus consent to the transaction

and render it binding, if it acquiesces, strangers cannot object. This is true of contracts and other transactions between two corporations having directors or other officers in common. They are not absolutely void, but, at the most, merely voidable, and may be rendered binding by ratification or acquiescence on the part of the stockholders. Ratification is to be implied if the corporation accepts or retains the benefit of the transaction (assuming, of course, that it can do otherwise), with knowledge of the facts; and it may be implied from acquiescence. Ordinarily, it is for the corporation—the stockholders collectively—to ratify or disaffirm the transaction, and individual stockholders cannot object. Of course, ratification or acquiescence by a majority of the stockholders cannot bind a dissenting stockholder where the transaction is a fraud upon his rights, or beyond the powers of the corporation, and cannot prevent the dissenting stockholder from suing in a proper case to set the transaction aside, and obtain redress for the benefit of the corporation, as has been explained in a former chapter. But where the transaction is of such a character that it might lawfully have been authorized by the majority, it may be lawfully ratified or acquiesced in by them, and their ratification or acquiescence will bar an action by a dissenting minority to set it aside. The board of directors may ratify a transaction if they could have authorized it, but not otherwise. When they do undertake to ratify, a majority must be disinterested. It is also well settled that the corporation and the stockholders may and will lose the right to have the contract or transaction set aside by *laches* in exercising their option to disaffirm it. Whether the delay in electing to set the transaction aside constitutes *laches,* so as to bar the right to relief, will depend upon the circumstances, and not merely upon the length of time which has elapsed. It was said by Mr. Justice Miller in a leading case in the supreme court of the United States, in which a director had purchased property of a corporation at a sale under a deed of trust: " 'The doctrine is well settled that the option to avoid such a sale must be exercised within a reasonable time. This has never been held to be any determined number of days or years as applied to every case, like the statute of limitations, but must be decided in each case upon all the elements of it which affect the question. These are generally the

presence or absence of the parties at the place of the trans-
action, their knowledge or ignorance of the sale and of the
facts which render it voidable, the permanent or fluctuating char-
acter of the subject-matter of the transaction as affecting its
value, and the actual rise or fall of the property in value during
the period within which this option might have been exercised.
*Laches* may bar the right of a corporation or its stockholders
to maintain a suit to compel directors to account for secret
profits.    Individual stockholders may be estopped to attack a
contract or other transaction on behalf of the corporation on
the ground that directors or other officers were personally inter-
ested.    If they participated or consented, or if they have rat-
ified the transaction with knowledge of the facts, they are
clearly estopped.    Stockholders will not be heard to complain
of their own acts as directors.    The right of individual stock-
holders to complain may also be barred by *laches.*"    Clark on
Corporations, paragraph 764.

This text is supported by authorities too numerous to mention
or examine, one of which is the leading case of *Foss* v. *Har-
bottle,* 2 Hare 461, in which the Vice-Chancellor, after laying
down the rigid rules of law, requiring the exercise of the utmost
good faith on the part of promotors of corporations, treating
them as acting in a fiduciary capacity, proceeds as folows:    "If
persons, on the other hand, intending to form a company,
should purchase land with a view to the formation of it, and
state at once that they were the owners of such land, and pro-
pose to sell it at a price fixed, for the purposes of the company
to be formed, the tranaction, so far as the public are concern-
ed, commencing with that statement, might not fall within the
principle of *Hichens* v. *Congreve.*    A party may have a clear
right to say—'I begin the transaction at this time; I have
purchased land, no matter how or from whom, or at what price;
I am willing to sell it at a certain price for a given purpose.' "
Another is *Twin-Lock Oil Co.* v. *Marbury,* 91 U. S. 587, hereto-
fore quoted from.    It holds: "The right of a corporation to
avoid the sale of its property by reason of the fiduciary rela-
tions of the purchaser must be exercised within a reasonable
time after the facts connected therewith are made known,
or can by diligence be ascertained.    As the courts have
never prescribed any specific period as applicable to every case

like the statute of limitations, the determination as to what constitute a reasonable time in any particular case must be arrived at by a consideration of all its elements which effect that question." In *Stewart v. Railway Co.*, 38 N. J. L. 505, Mr. Justice Dixon, delivering the opinion of the court, said: "After an examination of all the cases cited, as also such others as I have found, and a careful consideration of the principle, and the results of regarding and disregarding it, I have come to the conviction that the true legal rule is that such a contract is not void, but voidable, to be avoided at the option of the *ceslui que trust,* exercised within a reasonable time. I can see no further safe modification or relaxation of the principle than this." In the late case of *Hodge v. United States Steel Corporation*, 54 Atl. R. I., decided February 18, 1903, Van Syckel, J., said: "It is a settled rule of corporation law that the personal interests of directors renders a transaction voidable at the option of the stockholders, and not void *per se*. Under the declaration of this court in the case last cited the shareholders may, within a reasonable time after the disclosure to them of the interest of a director, elect to avoid the contract; but, if an unreasonable time is allowed to elapse without exercising such option, during which the position of directors becomes so changed that it would be inequitable to vacate the engagement, equity would refuse to interpose."

On this question, it is useless to multiply authorities, for the principle is in perfect accord with both justice and common sense and underlies the whole doctrine of compensation. It is the principle of estoppel that gives the right to recovery for outlay and expenses where performance of a contract has been wrongfully prevented. *United States v. Behan,* 110 U. S. 338. It is on the basis of compensation, not punishment. Equity does not permit parties to play fast and loose with a contract, when they know money is being expended, labor performed and obligations contracted on the faith of it. They canont take an equivocal position, waiting for time to reveal whether it will prove to be a good contract or a bad contract and then accept it or reject it as may best subserve their own interest. Neither law nor equity permits any person intentionally to mislead another to his injury. Having, by their silence, led Thompson to believe that they would not disavow his contract, their ob-

jection to it, after he has acted upon it, comes too late to deprive him of compensation for his labor and outlay.

Having thus seen that no principle of law, nor any decided case, withholds from the appellee compensation for his outlay, as the legal consequence of the termination of his contract before completion thereof on either of the two grounds on which it was terminated, there is nothing in the former decision to deprive him of it. The language of both the opinion and syllabus is broad enough to carry it, and the principles declared do not inhibit it. So, according to both the letter and the spirit of the decision, he is entitled to it, unless precluded on some other ground.

Another objection urged against the allowance of Thompson's claim is the alleged purchase by him of the property of the Blackwater Boom and Lumber Company at the sale under the decree of June 23, 1893, and confirmed by the decree of August 4, 1893, as to which sale and the terms and conditions thereof see the opinion filed on the former appeal. 46 W. Va 56, 59. The ostensible purchaser at this sale was W. H. Osterhout, but the Thompsons, the appellee and his son, F. E. Thompson, furnished him, on some sort of terms, part, if not all, of the money for the cash payment, and became his sureties on the notes for the deferred payments. After the sale a new mill was purchased and erected in the place of the one which had been burned down under the receivership, a new company was organized, the Blackwater Lumber Company, and the stocking, cutting and marketing of the timber was resumed under the management of Frank E. Thompson, and so continued until the time of his death, by which event the appellee became the owner, by the statutes of descents and distribution, of all the estate of F. E. Thompson, including a large amount of timber to be cut at the mill under contract. The appellee then resumed the management of the mill and property, paid part of the money due on the notes, and, in 1898, purchased the interest of Osterhout and is now substantially the owner of all the property. He claims to have sold to the new company his locomotives, cars, steel rails, splices, teams, camp outfits, tools and appliances of all kinds. In addition to the circumstances indicating that the Thompsons were the real purchasers, a witness testifies that he had a conversation with them and Osterhout in which they as-

sured him that the mill and stocking business would go on after the sale as they had been run prior thereto. Thompson denies having made the purchase. Whether the charge is true, is not of controlling importance, for reasons now to be given.

Having erected its mill and obtained contracts of purchase of the timber standing on large tracts of land in the vicinity thereof, and commenced its operations, the Blackwater Boom and Lumber Company, on the 18th day of June, 1890, entered into a contract with S. W. Thompson and the appellee, Albert Thompson, for cutting and delivering said timber at the mill at certain specified prices per thousand feet. The lands mentioned in the contract from which the timber was to be so taken are those of the Marshall Coal and Lumber Company, containing twelve thousand acres, lying on both sides of the Blackwater River, H. G. Davis & Bro., Wm. H. Harness, J. G. Harness, W. W. Harness, H. C. Harness, H. J. Cooper, J. W. Parsons, G. S. Harness, G. H. Kuykendall, Jacob Van Meter and Ann Van Meter. In all the contracts for the purchase of the timber on these lands by the Blackwater Boom and Lumber Company, there were certain covenants, and among others, time limits for the removal of the timber, and the contract made with the Thompsons contained this clause: "All of said contracts are to be kept and observed as to detail by said Thompsons as binding upon them." Part of these lands lay along and near enough to the river to make it practicable to put the logs into it and drive them to the mill, while from others the timber had to be hauled. So the contract required the Thompsons to put the logs into the "mill pond at Davis in summer and to bullchain in winter." Owning the land on both sides of the Blackwater River, the Marshall Coal and Lumber Company, in its contract of sale of the timber to the Blackwater Boom and Lumber Company, granted to it the free and exclusive use of the river and its branches for floating, booming and manufacturing its timber, with the right to erect dams and mills for such purpose, and also the right to construct, on its lands, tram-roads for hauling the timber.

In the light of these facts, the following clauses of the Thompson stocking contract are to be read and kept in mind, together with what Thompson did under the contract, in order to clearly understand his situation when the property and rights of the

Blackwater Boom and Lumber Company were sold free, and discharged, from the obligations of his contract:

"9th.   Said Thompsons agree to make all river improvements and repairs to river piers, dams, booms, etc., while said river improvements are used by them, excepting always dams, piers, booms, etc., at the mill; but said Thompsons agree to renew the boom and renew the piers, down to the water even at the mill pond, once during this contract when said boom and piers need said repairs; and said Blackwater Boom and Lumber Co. agree to furnish the standing timber for said repairs to Davis boom and piers at mill."

"10th.   The Blackwater Boom and Lumber Company agree to sell and S. W. and A. Thompson agree to purchase all effects used by said Co. in stocking and driving as follows, to-wit, horses, harness, wagons, tools, supplies, and camp outfits also co.'s blacksmith shop at Davis, with its tools and supplies in shop and ordered; all effects at a fair valuation, but if parties cannot agree at a fair valuation then the valuation of above property shall be decided by a board of arbitration, to be composed of parties agreeable to both parties hereto.  It is mutually agreed that 'one have' the purchase price of above property be paid on 20th Aug. and one-half be paid on 20th Sept., 1890."

"11th.   It is mutually agreed by the parties hereto that in case any improvements not sold as above provided for be used by said Thompsons, such as camps, slides, &c, said Thompsons agree to pay for use of same, excepting camps along the river, for which no charge is to be made, for a consideration to be agreed upon."

"12th.   The Blackwater Boom and Lumber Co., agree to grant to said S. W. and A. Thompson all the rights and privileges held by them under the Marshall C. & S. Co. contract and under other contracts to erect dams, booms, piers and erect and build bridges and tramroads, but only for the purpose of carrying out this contract; and the said Blackwater Boom and Lumber Co. agree to proceed under their contract for the purpose of condemning rights of way, etc., provided said Thompsons pay all costs, judgments and damages under said condemnation proceedings, always provided said Thompsons require said proceedings to carry out this contract."

Thompson shows that, under this contract, he expended $1,700.00 on the dams in the river, and constructed two and one-half miles of tramroad, called the "Harness Tram-road," at a cost, exclusive of rails, splices, spikes and switches, of $3,-200.00, and 11 210-320 miles of standard guage tram-road, at a cost, as aforesaid, of $19,582.25, besides two bridges across the Blackwater River at a cost of $1,200.00. In addition to this, he built engine houses, a repair shop, sand house and necessary switches, put the steel on the roads and equipped them with three locomotives and cars, making a total outlay of $53,-258.60, according to a statement filed as an exhibit with his petition. As tested by the items credited in the commissioner's report to the railroad and the tram-road accounts, this estimate appears to be under, rather than above, the actual cost. A large portion of this expense, it will be observed, was on account of the dams, bridges, and cutting and grading of roads which, by clause 12 of the contract, could be used by Thompson for no other purpose than that of the performance of his contract. By selling the Blackwater Boom and Lumber Company's property discharged from his contract, the purchaser obtained the benefit of these improvements. Though the rolling stock and the materials of the railroad might have been taken away and held by Thompson, the benefit of his expenditures upon the dams and bridges and in the opening and grading of roads, would have gone to the purchaser. At the time of the sale, there were several millions of feet of timber lying in the woods and streams on which work had been done to the amount of $12,399.63, payment of which could not be demanded by Thompson under the contract until after actual delivery which was prevented by the court. The purchaser took this timber discharged of Thompson's claim for labor done on it. Having completed and equipped his tram-roads at great cost, he was in a position to earn profits in the performance of the unexecuted part of his contract, and by purchasing the property himself, if he did so, he thereby paid into the hands of the court the supposed value of his work on the dams, bridges, roads, &c., and said sum of $12,399.63 due to himself for work done on timber not delivered. His bid may not have provided for any profits, as by becoming the purchaser he secured to himself the right to continue and complete the logging of the timber. Had

he purchased subject to his contract, the sale would not have deprived him of the benefit of his permanent improvements, and he would have been compelled to pay, in addition to the purchase money, said sum of $12,399.63 due to himself, as well as profits thereafter accruing by the completion of the logging contract. If Osterhout was a *bona fide* purchaser of the property discharged of the Thompson contract, it is perfectly clear that he obtained and paid for said permanent improvements, and the timber on which Thompson had done work for which he had not been paid. What he paid for these went into the hands of the court, and Thompson is equitably entitled to it. If, on the other hand, Thompson was, in fact, the purchaser, he purchased on the same basis and paid his own money into court to be returned to him to the extent of the value of said improvements and the amount due for work done on timber. Assuming that Thompson put in both bids, $72,500.00 subject to his contract and $110,000.00 discharged from his contract, the latter having been confirmed, the difference of $37,500.00 indicates that a large amount was paid by him for the privilege of retaining the benefit of his expenditures. It also indicates that the bidders, parties to the suit and the court, in ordering and confirming the sale, understood that, on one basis, the purchaser should allow Thompson to continue his contract and pay him all demands thereafter accruing under it, and that, on the other, he should not be liable to Thompson for anything and that Thompson should look to the purchase money in the hands of the court for the satisfaction of any claims he might have.

In cases of breach of contract, money paid out and expended by the plaintiff to prevent or lessen the resulting damages is recoverable. A man is not precluded from recovering because it is in his power, by the expenditure of his own money, to save himself from the injury inflicted by the other party. Sutherland on Damages, in treating of the elements of damages, says at section 88, (3rd ed.) : "Fifth, such losses may consist of labor done and expenses incurred to prevent or lessen damages which would otherwise result from the defendant's default or misconduct. The law imposes upon a party injured by another's breach of contract or tort the active duty of using all ordinary care and making all reasonable exertions to render the injury as light as possible. If by his negligence or wilfulness he al-

lows the damages to be unnecessarily enhanced, the increased loss,, that which was avoidable by the performance of his duty, falls upon him. This is a practical obligation under a great variety of circumstances, and as the damages which are suffered by a failure to perform it are not recoverable it is of much importance. Where it exists the labor or expense which its performance involves is chargeable to the party liable for the injury thus mitigated; in other words, the reasonable cost of the measures which the injured party is bound to take to lessen the damages, whether adopted or not, will measure the compensation the party injured can recover for the injury or the part of it that such measures have or would have prevented. This is on the principle that if the efforts made are successful the defendant will have the benefit of them; if they prove abortive it is but just that the expense attending them shall be borne by him." The latter part of the same section demonstrates the duty to make the loss as light as possible in case of notice of rescission given by one party to the other, but it also appears that money expended in doing so is recoverable. This equitable and common sense principle must be applied here, and, therefore, if Thompson was the actual purchaser, the circumstance does not preclude the allowance of his claim.

In support of the view here taken, the following is quoted from the decree of confirmation of the sale: "The said special receiver is directed to execute and deliver to the said William H. Osterhout, the purchaser, a deed conveying to him all the property, real and personal, and also all the corporate rights, powers, privileges and franchises of the said Blackwater Boom & Lumber Company, together with all the improvements made in said Blackwater river and its tributaries, including dams, piers and booms and all standing timber belonging to said company, and all the rights, powers and privileges conferred upon said company under and by virtue of the contracts set forth in the decree of sale, other than the logging contracts with S. W. and A. Thompson; and in said deed said receiver shall reserve a lien for unpaid purchase money upon the real estate conveyed and upon the leasehold property held under leases from H. G. Davis and others and upon all improvements thereon; and the said receiver, Fairfax S. Landstreet, is directed forthwith to turn over and deliver to the said purchaser, William H. Osterhout, the possession of all said property, real

and personal, and all the original timber contracts aforesaid."

If the price paid was inadequate, it is too late to suggest that the inadequacy is the result of manipulation on the part of Thompson or of collusion between him and Osterhout. That would have been ground for resisting confirmation of the sale, but it can have no bearing on the question of Thompson's right to compensation or the amount thereof. The sale was widely advertised and was public and open to the world and the confirmation without objection on the part of creditors or stockholders estops them from denying the fairness of the sale or adequacy of the price. At any rate, it has no connection whatever with the matter now under consideration.

The foregoing principles and conclusions settle the most important question in the case, but do not cover the exceptions touching specific items entering into the account, the mode of statement and the evidence upon which the balance struck depends. Under exceptions 1, 2, 3, 6, 12 and 13, it is insisted that Thompson's contract was divisible, that the executed part of it could not be considered in ascertaining his compensation, and that the sums expended in getting out the timber which had been paid for and the amounts received on account of it, should not have been charged and credited in the statement, for the reason that if, in any instance, Thompson, had lost money on any particular lot of timber, the loss was, by such method of statement, wrongfully charged to the company since it ought to be borne by Thompson, and if, in any instance, a profit had resulted, it was wrongfully given to the company, as it belonged to Thompson. If, on the last stated hypothesis, any error has been committed, it is not prejudicial, but beneficial, to the appellants and they cannot complain of it. If, on the former, any error was committed, it is prejudicial, but the burden is upon the appellants to show that such losses sustained were carried into the general balance against the company. This they have failed to do. They point out no instance of such charge, and have introduced no evidence showing it. Moreover, it is a question of fact on which the commissioner and the court below have passed, and their finding cannot be disturbed by this Court unless plainly wrong. How is it possible to determine the amount of compensation on the basis of charging all expenditures and the value of work and labor, and cred-

iting all sums received, without including those relating to the executed part of the contract? The lengthy argument of the brief on this point not only fails to point out any wrong done, but also to show how it is possible to arrive at the amount necessary to reimburse for outlay in any other way with any degree of certainty.

Exceptions 9, 10, 11, 14, 15 and 17 present the contention that the expenditures for permanent improvements and preparations for the execution of the contract should be apportioned between the executed and unexecuted parts of the contract, on the theory that if, when interrupted, his contract was three-fifths performed, he should be allowed only two-fifths of such expenditures. The authorities cited for this do not support it. The first is *Watts* v. *Camors*, 115 U. S. 353, holding that a clause in a charter—party whereby the parties bind themeselves, etc., "in the penal sum of estimated amount of freight," to the performance of the agreements contained in the contract, is not a stipulation for liquidated damages and is discharged by payment of the actual damages sustained by breach of the agreement. Another is *Steamship Co.* v. *Card*, 59 Fed. Rep. 159, holding as follows: "In awarding damages against a charterer for refusing a vessel, the net freight earned by obtaining another—less valuable—cargo is to be deducted from the sum which would have been earned under the charter." Another is *Transfer Co.* v. *Merchants & Co.*, 12 App. Div. N. Y. 260, applying the principle of the last named case in determining the measure of damages for breach of an agreement to take and deliver the output of an ice manufacturing plant. Another is *Ewing* v. *Codding*, 5 Blackf. Ind. 433, an action by a landlord against the tenant for breach of an agreement to deliver one-third of the crops as rent, in which it was held that, in assessing the damages, the defendant might prove, in mitigation thereof, that, after the making of the lease, the plaintiff, with defendant's consent, had leased a part of the premises to a third person, from whom he had received rent for that part. The last one is *Jebsen* v. *Dock Co.*, L. R. 10 C. P. 300, relating to reduction of damages resulting from a breach of a contract concerning one ship by applying profits earned with another ship. These authorities, except the Indiana case, all relate to damages by prevention of anticipated profits, and not to com-

pensation for outlay and expenses, and are so obviously inap-
plicable to the proposition contended for that it would be a
waste of time to comment on them. Nor has the *Ewing* v. *Cod-
ding* case the remotest bearing on the question. By consent of
parties part of the land, and consequently, part of the rent,
were eliminated from the contract. The proposition is not only
unsupported by any authority, but is also at variance with the
law of compensation and reimbursement as laid down by the
courts. It is an element in every case of damages for preven-
tion of the performance of a contract and is ascertained upon
the following basis: "When one party enters upon the per-
formance of a contract, and incurs expense therein, and, being
willing to perform it, is, without fault of his own, prevented
by the other party from performing, his loss will consist of two
distinct items of damage: 1st, his outlay and expenses; 2d, the
profits he might have realized by performance, which profits
are related to the outlays and include them and something more.
The first item he may recover in all cases, unless the other party
can show the contrary." *United States* v. *Behan,* 110 U. S.
338. Here there is no question of profits. It is one of outlay,
time, labor and expenses and is governed by so much of the
foregoing rule as relates to reimbursement for outlay. The
idea of apportionment here contended for is nowhere to be found
in it, nor do its terms leave any room for it. "But as Towne
saw fit to say that the special contract was not binding upon
him, it cannot be set up by his executor as binding upon the
plaintiff. *King* v. *Welcome,* 5 Gray 41. It cannot be treated
as a nullity for one purpose, and as a contract for another. It
required two years for its completion, and both parties under-
stood that there was to be no profit or advantage to the plaintiff
except from the operation of both years taken together. A large
part of the labor and expense, incurred in the first year, had
no reference whatever to the operations and results of that
year, taken by itself, but were a preparation of the land for
increased productiveness in the second year. The plaintiff
must be considered as having, in that way, paid in advance,
in part at least, for the privilege of using the land the second
year in the manner agreed upon. By the repudiation of the
contract, he has lost the privilege which he had so paid for.
The consideration upon which he made that payment has failed

by the wilful act of the other party to the contract, and he is therefore entitled to recover back what he has so paid." *Williams* v. *Bemis,* 108 Mass. 91.

To apportion the expense for permanent improvements between the executed and unexecuted portions of the contract, on the theory that Thompson has had three-fifths of the benefit of them would be inconsistent with the rule of compensation adopted and contrary to the facts as regards the alleged reception of the three-fifths of the benefit of them. Everything received by him goes in reduction of his bill for services and outlay. Every dollar paid by him, profits on the executed work included, is charged against his bill. How can it be said, then, that he has had the benefit of these improvements so far as the contract has been executed? The rule of compensation as laid down by the court deprives Thompson of all his profits, past and future, directs that he be made whole, nothing more, nothing less, and excludes any inquiry as to allowances of, or deductions for, profits benefits and losses.

In this connection, it is contended that Thompson should not be allowed the money expended in the construction of the railroad because he hauled over it more of F. E. Thompson's timber than of the company's timber. In order to reach the Van Meter tract of timber owned by the company, and which Thompson was bound to log under a short time limit, it was necessary to build the road through the C. E. Harness tract, the timber on which belonged to F. E. Thompson, or to the company and was to be logged by said F. E. Thompson. Albert Thompson having built his road through said tract, hauled timber from it for F. E. Thompson and has credited in his statement against his expenditures, the hauling of said timber at fifty cents per thousand and testifies that there was a profit in it to him and therefore to the company. But it is said he hauled more timber on this road for his son than he hauled for the company, and, that, therefore, he did not build it for use under his contract with the company. This position is untenable. He was bound to take the timber from the Van Meter tract, No. 8, the W. H. Harness tract No. 11, and the J. W. Parsons tract No. 12, under time limits, all lying beyond the C. E. Harness tract, from which he incidentally hauled timber for F. E. Thompson. The situation of these lands necessitated the hauling of the timber by a rail-

road or in some other way. He may have hauled more of his son's timber than of the company's, too, but the question is not what was actually hauled. It is the purpose for which the road was built and that is very apparent from the facts stated. Had he been permitted to complete his contract, the relative amounts actually hauled for the company and for F. E. Thompson would in the end have been in a proportion very different from what they are now. It is further objected, in this connection, that Thompson hauled some bark and pulpwood of his own over this road, and, for hauling bark, purchased some bark cars. These were used not only in hauling bark, but also in hauling supplies to the camps along the road, the log cars being unsuitable for that. He has credited what he deems a fair price for the hauling of the bark, and the cars are credited at a little more than what they cost. All this seems to be purely incidental, and does not prove the road to have been built for a purpose other than the carrying out of the logging contract.

Again it is urged that compensation cannot be had because the work under the contract was prosecuted in the name of a corporation organized by Thompson called the Forest City Lumber and Improvement Co. No authority is cited in support of the contention and the argument in its favor is far from convincing. If a contractor can employ individuals to aid in carrying on his contract why can he not, on the same principle, procure the work to be done by a corporation? Must he do all the work with his own hands or keep the business all in his own name? If he chooses to operate through a corporation so as to limit his liability on claims for damages as to third persons, or to keep one branch of his business separate from others, is that a matter which in any way prejudices or concerns the other party to the contract, even if it be in some sense immoral or even contrary to public policy, as charged in the argument? Whether it is immoral or otherwise wrong, we have no occasion to say.

Exception No. 22 comprises six different items. The first is $4,750.00 charged by Thompson for his personal services. The objection seems to be that he charged this as a salary at $1,500.00 per year as president of the Forest City Lumber and Improvement Co., a mere instrumentality in his hands for the execution of the work under his contract. As already indicated, there is nothing in this objection. The second is to the al-

lowance of three items of $1,500.00, $300.00 and $878.35, paid by Thompson to three sub-contractors, Talbord, Bartlett and Whitcomb. These were paid to discharge liabilities thrown upon him by the interruption of his work under the main contract, and he was bound to pay them. They were necessary expenditures, but it is said they were disallowed by this Court on the former appeal. No reference to them is found in the opinion and there is no more reason for saying they were disallowed than for holding many thousands of dollars of other expenditures to have been so cut out. The third objection is to the allowance of $65.00 expended by Thompson in hunting a locomotive, because he is allowed $1,500.00 a year for personal services. Are his expenses to come out of his small allowance for services? The fourth relates to the bark cars, which has been disposed of. The fifth is of the same nature and relates to an item of $400.00 for lumber cars, which Thompson used in hauling his own lumber, as well as for purposes of his contract. They were sold and the proceeds credited as well as their earnings in hauling his lumber. The sixth is to all items in the account, because they were paid by the Forest City Lumber and Improvement Co., and not by Thompson. Nothing further need be said on that subject.

Exceptions Nos. 5, 16, 18 and 19 relate to questions of competency, relevancy and sufficiency of the evidence upon which the report is based. It is shown that many of the items charged were not found on the books of the Forest City Lumber and Improvement Co., or the Blackwater Boom and Lumber Co., but were taken from Thompson's private memoranda, or inserted upon his verbal representations. The commissioner has made a complete list of all the items not taken from the books. Those in Thompson's favor are principally items of rent, wages of S. W. Thompson, superintendent, services of Albert Thompson, amounts paid Tolbard, Bartlett and Whitcomb, an item of $230.00 paid the Blackwater Boom and Lumber Co. for loss of timber on the Van Meter land not removed within the limit of time specified in the contract, and an item of $450.00 paid for a team of horses and harness. These charges amount to $14,271.94, and, with the exception of three or four small items, were all fully explained by Thompson in his testimony and shown by him to be proper charges, under the principles of law hereinbefore announced. The items on the other side of the ac-

count not taken from the books amount to $26,357.97, composed of credits for stocking and hauling for F. E. Thompson and the proceeds of the locomotives, cars, rails, horses, harness, wagons, &c., sold to the Blackwater Lumber Company. It is not perceived that any wrong has been done the appellants in respect to any of these items. But it is said the accounts concerning work done for F. E. Thompson and for the Blackwater Boom and Lumber Company have been so mingled as to render it improper to allow any of the items to enter into a statement for the purpose of ascertaining the amount expended by Thompson under his contract. No instance is specified in which money, laid out on work for F. E. Thompson, is charged in favor of Albert Thompson, without a corresponding credit for the stocking and hauling of his timber at fair prices, the same, or about the same, prices as those paid Albert Thompson under his contract. All the timber logged for F. E. Thompson went to the Blackwater Boom and Lumber Company. Its books, as well as Thompson's, must have shown the amount of it so far as delivered. Is Thompson to be deprived of all compensation because he is unable to separate these accounts, when it is evident that the balance found by charging and crediting as aforesaid is substantially the true balance? As his work progressed, there was nothing in the situation to apprise him or the other interested parties that it would ever become necessary for him to produce the evidence now demanded and it is as clear, full and fair as could be expected under such circumstances. The books of the two companies were open to the commissioner and counsel on both sides and were thoroughly and critically examined by the former and from them and the testimony taken, he has arrived at a conclusion which the circuit court has confirmed. The evidence on which it rests is neither incompetent nor irrelevant, and there is nothing to pass upon but its sufficiency. How can this Court disturb the finding, if the appellants are unable, as apparently they are, to show wherein or how they have suffered from an erroneous finding upon the evidence? They fail to show or indicate that any money was lost on the work done for F. E. Thompson, nor do they put a witness on the stand who denies Thompson's claim that there was a profit in it. If it was profitable, how are they injured? If so, how can it be otherwise than that they are benefited?

Does the amount of this decree as compared with the former one indicate injustice? It is suggested that Thompson now has a decree for outlay, services and expenses about equal to his former decree for these and profits added. But the record does not verify the charge. Under the former decree, he had, on account of the claims included in the present decree, principal sums decreed to him, amounting to $94,433.50, and, under the present decree on the same accounts, after his claim for profits has been eliminated, about $48,000.00, making a difference against him of about $46,433.00. From the $48,000.00 now allowed, deduct the item of $12,399.63, representing uncompleted work on timber actually felled, and the remainder is $35,600.37 the amount decreed for money expended, not directly upon the timber, but in making betterments, and improvements and other preparations for carrying on the work. In view of what has been shown respecting the character and magnitude of this work, the Court cannot say the amount is unreasonable and unsustained by the evidence. It is suggested in this connection, however, that there is inconsistency, condemning and rendering worthless Thompson's testimony and all his evidence, in this, that, in obtaining his former decree, he swore his contract was a profitable one, and now shows it to have been a losing one. The basis of the former and present estimates are entirely different. When Mr. Thompson, on the former inquiry, testified that $10,000.00 had been sunk in the first year, and almost made up by the profits of the second year, he spoke of profits, not outlay and expenses. Just how he estimated them does not appear. The present inquiry is upon an entirely different basis, and, even if there be inconsistency, and the logic of facts shows the present result to be reasonable and just, is it to be cast aside and justice withheld because of such inconsistency? The great bulk of the expenditures and receipts by Thompson is shown by items taken from books, the correctness and accuracy of which have not been impaired or overthrown. There is a substantial check upon them found in the books of the Blackwater Boom and Lumber Company. All of them, both sets, have been open to the commissioner and counsel. Who has pointed out any omissions, any padding, any false or fraudulant entries? There is not an intimation of such a thing anywhere in the record or the argument. There is no suggestion of fraud in connection with the

omissions from the books of certain credits and charges reported by the commissioner as not having been found on the books.

This disposes of all important exceptions and assignments of error respecting the principles on which the account is stated and the items thereof. But two errors, not made the subjects of exceptions nor mentioned in the assignments of error, have been discovered. The receiver paid Thompson in August, 1893, interest amounting to $330.68, which has not been credited in the account against him, though charged in his favor. He is credited as of October, 1894, with $15,955.00, proceeds of property sold, and, as of December, 1895, with $2,000.00 on account of property sold. These sums should have been credited as of August, 1893, for Thompson used them from that date until they were sold, and he ought, therefore, to pay, as compensation for their use, at least the interest on the sums for which he sold them. Making these corrections, and deducting $34.50 interest on small items disallowed by the circuit court, the sum found to be due him as of the 12th day of June, 1901, is $80,288.96 of which $47,873.62 is principal and $32,415.34 is interest.

The last contention is that the court erred in decreeing the amount due the appellee to be a lien upon the assets of the company. As this question was adjudicated on the former appeal, the court below could not, nor can this Court now, disturb that conclusion and determination. Point 4 of the syllabus declares that Thompson's "compensation is entitled to a preference of payment out of the corporate assets in the hands of the receiver in equal priority with the other obligations of the receivership." That decision may be wrong, though we do not say it is, but it is, and must remain, the law of this case, however erroneous it may be. *Camden* v. *Werninger,* 7 W. Va. 528; *Horn* v. *Perry* 11 W. Va. 694; *Henry* v. *Davis,* 13 W. Va. 230; *Northwestern Bank* v. *Hoges,* 37 W. Va. 475.

As there is no error in the decree except in respect to the omission of said sum of $330.68 from the credit side of the account and the failure to charge Thompson with the use of the property from the date of the decree of confirmation until disposed of, as hereinbefore stated, it will be corrected and modified in these respects and, as so modified, affirmed, and the cause remanded for further proceedings, but, as this reduces the amount

of the decree by the sum of $4,505.95, the costs in this Court will be decreed to the appellants.

ON PETITION FOR RE-HEARING.

Additional opinion by POFFENBARGER, PRESIDENT:

A petition for re-hearing sets up one new contention, namely, that, while the statement of the commissioner shows over 13,-000,000 feet of timber was hauled for F. E. Thompson, for which credit is given, only 6,205,000 feet less than half as much, is credited as having been stocked for F. E. Thompson. This discrepancy, if credited, at $4.50 per thousand feet would amount to over $30,000.00, and it is urged that the allowance to Thompson should be cut down by about that much. It is rather strange that such an amount should have been overlooked until this late hour, especially so in view of the strenousness with which this contest has been waged on both sides, but if the claim has any foundation in the record it is made in time. Only the amounts paid by F. E. Thompson for stocking his timber are proper credits. If the 7,000,000 feet and over, stocked for him and not so credited, was paid for by the Blackwater Boom and Lumber Co., upon the order of F. E. Thompson, and is, therefore, included in the cash credited in the statement, it is not only accounted for, but to credit it up as timber stocked for F. E. Thompson would give a double credit. Credit for $170,000.00 as cash, notes and drafts, exclusive of commissions paid Thompson on sales of lumber, is given in the statement. At an average price of $4.00 per thousand, this represents 42,374,000 feet; at $4.50 per thousand, it represents 37,777,000 feet; and at $5.00, covering both stocking and hauling, it represents 33,901,000 feet. Thompson gives the total amount of spruce timber scaled under his own contract as having been 25,643,710 feet. Add to this 13,000,000 feet as having been stocked for F. E. Thompson and the result is 38,643,710 feet. Add to 33,901,000 feet, represented by the cash credited by Thompson, the 6,200,000 credited as having been stocked for F. E. Thompson, and the result is 40,101,000, but little more than the total found by the other method. But there was some hemlock timber put in by Thompson under his own contract, not included in the 25,643,710 feet. The amount, however, is

comparatively small. Of the 6,205,000 feet shown by the statement to have been stocked for F. E. Thompson, only 313,297 feet was hemlock. Albert Thompson cut but little hemlock under his own contract. R. W. Eastham testified that, in saying all the timber of easy access on the 12,000-acre Marshall tract had been cut, he meant the spruce and that no hemlock on that tract above the dam had been cut. Meyer, secretary of the Marshall Company filed a statement from which it appears that Thompson logged, from the Marshall tract, under his contract, 19,210,065 feet, of which only 1,712,369 feet was hemlock. Making an allowance of 2,000,000 feet of hemlock as having been cut by Albert Thompson under his own contract in addition to the 25,643,710 feet of spruce, and then adding 13,000,000 as having been cut for F. E. Thompson, the result is 40,643,710 feet. Take another test. From the statement exhibited with the deposition of H. A. Mayer, it appears that Thompson logged from the Marshall tract 19,210,065 feet. Most of this went in by the river. As the railroad runs through a corner of the tract, some of this timber may have been hauled in. Thompson says he hauled in about 10,000,000 feet for the company and about 13,000,000 feet for F. E. Thompson. Adding these three amounts, we have 42,210,065 feet, for some of which Thompson has not been paid. For unpaid work on it he had in the present decree $12,399.63. Besides, the report of the receiver shows 16,735,682 feet to have been "in stream and skidded in bush," much of which was no doubt from the Marshall tract. From this it is manifest that there can be no such discrepancy as is claimed, and that there is probably none at all. The commissioner and counsel on both sides all had access to the books, knew the basis on which the account was being made up, and had the witnesses before them, and there is a presumption of correctness as to the finding which cannot be overcome by a mere suspicion or surmise which the evidence in the record strongly tends to contradict. Though it may not appear from the record that payments for stocking F. E. Thompson's timber were made directly to Albert Thompson by the Blackwater Boom and Lumber Co., the books of the two companies almost certainly show how these payments were made, and they were at hand when this account was made up

by the commissioner. And it does appear here that Albert Thompson has been paid by the Blackwater Boom & Lumber Co., for more timber than he stocked for it under his own contract with it, in fact about the amount he stocked under his own contract and F. E. Thompson's contract, less the 6,200,000 credited as timber stocked for F. E. Thompson, and all the money so received is credited in the account stated by the commissioner.

This petition renews, in slightly different form, the contention that Thompson is precluded from claiming the money expended by him because the expenditures were made in the name of the Forest City Lumber Company. It says he paid $25,000.00 for the stock of that Company which he still holds, wherefore said sum should be deducted from the amount allowed him. That corporation was organized for the sole purpose of carrying out Thompson's contract, and all the money paid into its treasury as capital stock or otherwise was Thompson's money. It never had any assets except the money expended through it by Thompson in the execution of his contract and the money derived by Thompson from his contract through it as an agency used in the execution thereof. All these sums are carried into this account as charges and credits, the Forest City Company is defunct, and its stock is but waste paper in Thompson's hands. The corporation had no substantial existence, nor its stock any value, save as an instrumentality in the execution of the contract. To make such deduction, therefore, would be to substitute a mere shadow for substance, and subordinate equity and justice to a barren technicality.

It is further insisted in the petition that the former adjudication by this Court gave no lien for the amount now found to be due to Thompson, because the present claim was not then before the Court. All the items in the account as now stated were not then in the record. Some of them were, but not stated in the present form. The claim that formed the basis of the former decree was for damages for breach of contract, composed of two items, outlay and gains prevented, as formerly explained. This Court said the latter could not be allowed, but that, upon the ascertainment of the former, a decree therefor should be entered, giving a lien for it upon the assets of the company, and, for that purpose, the cause was remanded to the circuit

court. Was not every question except that of the amount of compensation thereby adjudicated? The present demand was before the court as a part of the original claim. Thompson's original petition sets forth as an item of damages the cost of constructing his tram-roads, repairs of dams and building of bridges, amounting to $53,258.60, and his amended petition sets up the claim for $12,399.63, making in all more than $67,-500.00. But this Court said, all sums received by him must be deducted. This necessitated a restatement of the account and the addition of many items both of debit and credit, resulting in a decree for about $48,000.00 instead of $67,500.00. It is argued that the language of the last clause of point 4 of the syllabus of the case as reported in 46 W. Va. 56, saying "which compensation is entitled to a preference of payment out of the corporate assets in the hands of the receiver in equal priority with the *other obligations of the receivership*," amounts to a construction of all the language used by the Court on the subject of lien, and negatives the allowance of anything but the $12,399.63 item because it says the amount shall have priority with the "other obligations of the receivership." In other words, the whole amount must be an obligation of the receivership to make it a lien on the assets, but does not the Court declare and decide that "a just compensation for the actual expenditure of labor and money in fulfillment of his contract, subject to a deduction of all sums paid him" shall be allowed priority with the other obligations of the receivership? It must be one of such obligations to satisfy the sense of the words "other obligations" of the like kind. The question is, what did the Court decide, not whether it decided correctly. Properly or improperly it has plainly declared the demand to be an obligation of the receivership and entitled to priority, and remanded the cause for a decree in accordance with the adjudicated principle governing the cause. It was binding upon the court below, (*Butler* v. *Thompson,* 52 W. Va. 311), because it was an adjudication. What is *res judicata* as to one court is *res judicata* as to all others, and there is no escape from it except where an appeal exists. An appeal to this Court from its own decision rendered years ago does not lie.

*Modified.*

DENT, JUDGE, *(dissenting)*:

I cannot concur in the oppinion in this case for the reason that it is a misconstruction of and in violation to some extent of the former opinion herein. The facts and circumstances clearly show that Albert Thompson was the real purchaser of the property of the defendant company in the name of Osterhout, who was only nominally used to cover the transaction; that Thompson suffered no loss so far as his outlay and expenses were concerned but had really made a profit according to his own testimony at the time the sale of the property was decreed and that the larger bid was made by him on the theory that he would be able to cover the difference between the two bids by his account for profits not earned; and that having failed in this, his present account as to damages for outlay and expenses is an unconscionable demand to cover the difference between the two bids incurred by him under a misapprehension of the law as to his right to recover such unearned profits.

In becoming a purchaser of the property, it was Thompson's duty to take into consideration that the law imposed upon him, as the company's contractor, the obligation to use all ordinary means to save the company harmless from the expenditures incurred by him in carrying out his contract. 1 Sunderland on Damages, sec. 88, p. 184, and sec. 90 p. 188. This is a condition the law imposed upon him as a purchaser and which it must be assumed he fully understood at the time of his purchase and that he made the same with this understanding. Hence he could not have made the purchase with any legal expectancy of a recovery of his outlay and expenses from the company, owing to his knowledge that it was his legal duty to save the company harmless. Nor, did he, in making his bid, take into consideration his outlay and expenses, for the sale was made entirely free from his stocking contract which necessarily excluded all improvements made by him for the purpose of carrying them out, and gave the purchaser no right to such improvements without the consent of Thompson. This gave him such control over the property that no one else dare bid against him. For a purchaser, subject to the stocking contracts, would be entirely in his power, and a purchaser, free from the contracts, would be none the less so, the improvements made by him were essential to the enjoy-

ment of the purchase, and concerning which, a stranger in pur-
chasing, would have to deal with Thompson.  The property was
thus so incumbered that Thompson had it in his power to make
his own terms with regard thereto.  He made two bids; the
lower one subject to his contract; the higher bid was made with
the expectancy of the recovery of the unearned profits on his
contracts by reason of the abrogation thereof.  The Court held
in its former opinion that he could not recover these profits.
Hence he made a legal mitsake in bidding on the property with
such expectation.  To avoid such mistake, he comes back with an
alleged claim for expenditures for improvements made by him
in the expectancy of being permitted to carry out his contracts.
The law answers this demand by saying that it was your duty to
save your contractee harmless and you got the full enjoyment of
these improvements when you purchased the property and you
can recover nothing unless you can show that you have suffered
a loss by reason thereof.  This, Thompson could not possibly do,
for he had the full enjoyment of all the improvements under his
purchase, without paying anything additional therefor, such as a
stranger purchasing would have had to do to him.  The improve-
ments were no less to him but they not only deterred others from
bidding on the property but enhanced its value greatly without
his having to pay anything for such enhancement.  It is plainly
apparent, to the most simple minded, that Thomppson suffered
no loss, except the unearned profits denied to him by the former
opinion, and that he was led into a legal mistake in making his
higher bid in contemplation of the recovery of such profits.

   This is such a mistake that equity has no power to relieve
against, it being in no sense mutual or occasioned by the act or
conduct of the opposite party.  Yet the Court relieves him there-
from by allowing his unconscientous demand for improvements
and expenditures concerning which he suffered no loss but en-
joyed the full benefit thereof to the great enhancement of his
property.  In doing so, the Court in effect overrules its former
opinion and allows Thompson the greater portion of the profits
then denied him.  For this there can be no other justification or
excuse than the legal mistake made by Thompson in making his
higher bid.  While this may appear equitable, yet it is in violation
of the established rules and principles of courts of equity.
Hence my dissent.