**CONTINENTAL REALTY CORPORATION**

v.

**ANDREW J. CREVOLIN CO. et al.**

**Civ. A. No. 73-107-Ht.**

United States District Court,
S. D. West Virginia,
Huntington Division.

July 30, 1974.

John E. Jenkins, Huntington, W. Va., for plaintiff.

John J. Petro, J. Paul McNamara, McNamara & McNamara, Columbus, Ohio, Wilson Anderson, Steptoe & John-

son, Charleston, W. Va., for defendant General Ins. Co.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, a West Virginia corporation with its principal office and place of business in the State of West Virginia, hereinafter referred to as "Continental," seeks damages from Andrew J. Crevolin Company, a California corporation, with its principal office therein, d/b/a Oakridge Construction & Supply Company, hereinafter referred to as "Oakridge," Andrew J. Crevolin, a citizen and resident of California ("Crevolin") and General Insurance Company of America ("General"), a Washington corporation.[1]

Jurisdiction of this controversy, which involves more than $10,000 exclusive of interest and costs, is attained pursuant to 28 U.S.C. § 1332. The legal issues involved in this diversity action, as evidenced by the factual findings which follow, must be determined by the substantive law of the State of West Virginia. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Plaintiff, a wholly owned subsidiary of the United Realty Corporation which owns and operates a Holiday Inn Motel in the City of Huntington, West Virginia, was formed by the principals of United for the primary purpose of constructing, owning and operating a motel in Huntington, West Virginia, to be known as Downtown Holiday Inn.

Defendant Oakridge, whose principal is Andrew J. Crevolin, the individual defendant, was in the general construction business.

On August 13, 1971, Continental and Oakridge entered into a building construction agreement relative to the proposed Downtown Holiday Inn to be completed within twelve months after commencement of construction. The time for completion was subsequently amended to 305 days from November 1, 1971. The project was to consist of a high-rise hotel tower, garage and shopping area, all to be constructed in accordance with plans and specifications of a corporate architect (International Environmental Dynamics) closely affiliated with Crevolin by virtue of his ownership of stock therein. The contract originally called for payment by Continental of sums not to exceed $3,622,932.00, but was subsequently modified following modifications of the plans and specifications and demands by Oakridge to $4,200,754.00.

On January 25, 1972, General, as surety, entered into a labor and material payment bond and a construction performance bond for Oakridge, as principal, and Continental as obligee thereunder, in connection with the contract for the construction contemplated. The penal sum of the bond coverage was $4,050,754, which represented a figure $150,000 less than the contemplated maximum cost provided for in the construction contract. The $150,000 aforementioned represented additional fees to Oakridge paid by Continental and was known to General at the time of its bond execution. The additional fee was in the form of a promissory negotiable note dated December 27, 1971, and was paid at maturity by its maker, Continental.

Crevolin, on December 27, 1971, personally guaranteed the contract completion including payment of any costs of the project exceeding the maximum contract price.

The parties originally contemplated and the contract documents called for completion of the motel by April 20, 1973. By early April 1973, it was apparent to all that the construction would not be substantially completed as originally contemplated. Oakridge and Crevolin assured Continental, however, that the

---

I. While the file fails to reflect service of the complaint on Crevolin, individually, correspondence purporting to bear his signature has been received by the Court. In the interest of judicial economy the Court will address his potential liability reserving final judgment as to him until Plaintiff has had an opportunity to address the effect, if any, of said correspondence.

work would be substantially completed by June 15, 1973.

On May 31, 1973, the sad saga of the Downtown Holiday Inn escalated in that one of Oakridge's subcontractors, an electric company, in retaliation for the failure of Oakridge to pay for work done, caused the electric power to be cut off. While the power was subsequently restored, that date was the last day on which any substantial work was performed on the project. A strike and picketing by a local union caused the loss of three additional working days. Thereafter, however, unpaid subcontractors refused to work. Oakridge's financial condition being such as to result in its checks in payment for labor as well as payments to subcontractors being returned for insufficient funds. Efforts were made by Continental and Oakridge to resolve the difficulty, but to no avail. There is no doubt of Continental's continuous and unsuccessful demand upon Oakridge to resume work and perform its contractual obligations.

On July 12, 1973 the architects formally certified that Oakridge was in default of its contractual obligations, and Continental in turn, under date of July 20, 1973, called upon General to fulfill its obligations as surety.

That the course of construction of the Downtown Holiday Inn was one of great trial and tribulation from its early ·commencement is borne out by the record. As early as May 1972 difficulties were apparent. General seeks avoidance of its obligations by a contention, amongst others, that Oakridge was, by virtue of inaction on the part of Continental, permitted to perform work not in accordance with the plans, specifications and contract documents. The evidence not only fails to sustain this contention but discloses that what was within Continental's knowledge was as readily available to General. In short, General's contentions are that both design and structural deficiencies for which their principal was not responsible were the source of the difficulties giving rise to the instant suit.

That there were structural deficiencies of a major nature is factual. The evidence does not, however, sustain a contention of major design deficiency. The facts are that the difficulties to which General refers were ones created by their own principal.

That Continental found itself engaged in a project with a construction company of less competence than one expending several million dollars, one would reasonably expect, can be of no solace to General. Indeed one would assume that General's willingness to enter into the obligations it did in connection with the project, and its own failure to take any affirmative action in reference to its principal's poor performance, was, if anything, a matter of some encouragement to Continental.

█ To say now, as General does, that Continental should not have made payments for less than adequate materials such as double-tee beams is to exercise legalistic myopia. Such payments as were made were done so as required by the contract. The record discloses no instance of improper payments by Continental.

A recitation of factual minutia is unnecessary. The construction project can be summed up as one reeking with difficulties—apparent to anyone who was interested therein, one in which Oakridge failed to live up to its contractual obligations, and one in which Continental in no manner did less than live up to its obligations under the contract. The failure of the project was Oakridge's and Crevolin's.

The primary issue here is the extent of General's obligation as a consequence of the defaults of its principal coupled with its own alleged defaults.

█ The liability of Oakridge and Crevolin is patently clear. Without good cause, Oakridge simply abandoned the project in a manner which was not only violative of their contractual obligations, but in a manner so as to leave the project in such a condition as to be subject to serious water damage. It and its

guarantor, Crevolin, are liable. Oakridge unquestionably was in default pursuant to the terms of the contract at the time of the issuance of the declaration of default by the architect.

The reasonable cost of completion of the project as of the date of trial was $6,809,600.00, by reason of escalating costs estimated to be 2.4% higher than in January 1974. The time estimated to complete the project is six months.

Continental seeks damages against General both under the terms of its construction performance bond and for consequential damages, including loss of profits and attorneys fees, all allegedly incurred by virtue of an alleged improper course of conduct by General in its dealings with Continental.

It is Continental's contention, and the record sustains it, that after repeated demands on Oakridge to fulfill its contractual obligations, Continental, on July 20, 1973, called upon General to take appropriate action as contemplated in the construction performance bond and to make payments in accord with General's labor and material bond. General's failure to fulfill its obligations gives rise to Continental's claim that it is liable in sums in excess of the penal sum of the construction performance bond.

■ General, on the other hand, contends first that Continental in its dealings with Oakridge violated certain provisions of the construction contract which constituted a material breach of its obligation, resulting in a complete discharge of General. The answer to this contention has been disposed of in the Court's finding that in no manner did Continental do less nor more than its contractual obligation called for, and in no event did it do anything to the detriment of General. A specific instance of which General complains centers around the fact that Oakridge and Continental did amend their agreement in January 1973, which amendment was premised upon Oakridge's estimate that the cost

of completion of the project would exceed the contract price by more than $425,000.00.

General contends alternatively that its liability is the reasonable cost of completion less the balance[2] of the contract price, which the Court finds to be $253,568.68, including alleged retained percentage, and in no event more than the penal sum of the performance bond.

■ The Court finds that Oakridge and Continental did, with the consent of General, enter into an agreement in January 1973 premised upon Oakridge's estimate that the cost of completion of the project would exceed the contract price by more than $425,000.00. At that time, January 11, 1973, all parties recognized that there was not a sufficient amount of money remaining unpaid to Oakridge under the contract to assure completion of the work involved. The parties agreed that regardless of actual cost incurred by Oakridge, Continental would pay $100,000 monthly until up to $200,000 of the contract price remains unpaid. The $200,000 aforementioned was to be withheld until the completion of the project. Since such an amendment did no harm to General, and indeed was entered into with the consent of General, their complaint in this regard has no viability.

The agreement abrogated a prior agreement entered into between Continental and General for work done in October 1972, whereby Oakridge had agreed to place $200,000 in certificates of deposit with a bank until completion of the project. General's claim of overpayment by Continental to Oakridge is not sustained by the evidence. Indeed Oakridge, on June 22, 1973, caused to be filed a mechanic's lien against Continental in the amount of $2,200,000.00, a fact upon which General has at least in part attempted to justify the delay in settling its obligations to Continental. While the lien undoubtedly acted as a deterrent to additional financing on the part of

---

2. Change orders in the work amounted to additional costs of $150,676.40, which when added to the balance due Oakridge represents a figure of $404,245.08.

Continental, the record reflects that on February 14, 1972, Oakridge had executed and delivered to Continental a waiver of mechanics' liens covering past, then present and future work.

Under the terms of the construction performance bond, General was and is obligated to indemnify and save harmless Continental from all cost and damage by reason of Oakridge's default or failure to faithfully perform its contract. The contract called for liquidated damages in the sum of $1,333,333 per day of delay in completing the project. The bond provides that in the event of default on the part of Oakridge under the contract the surety will:

> (a) within fifteen (15) days of determination of such default take over and assume completion of said contract and become entitled to payment of the balance of the contract price, or (b) pay Obligee in cash the reasonable cost of completion, less the balance of the contract price including retained percentage. The cost of completion shall be fixed by taking bids from at least three responsible contractors chosen by Obligee and Surety. Surety will make such payment within fifteen (15) days after the cost of completion shall have been so determined.

General chose not to exercise its right to take over and assume completion of the contract and it was not until November of 1973 that General expressed its desire that the completion of the project be put out for bids to general contractors.

Of the four responses only one, that of Frank Messer and Sons Company, fully complied with the bid document provisions which called for a lump sum bid and completion bond. One Jack Davis, a contractor of Huntington, West Virginia, submitted a bid of $4,304,736, but announced his inability to secure a bond. Schurman Construction Company submitted a cost plus bid. It is General's present contention that the fourth bidder, Columbia Properties, submitted a bid of a lesser amount in accordance with the contract requirements. The simple answer to this contention is that rather than submitting a fixed price bid, they submitted an estimate of completion costs. In short, the only fixed facet of Columbia's submission was its management fee. The witness Gordon of Columbia testified that he did not comtemplate its submission to represent a guarantee of costs nor was it willing to enter into a contract under its submission which would fix the costs as estimated by him as the maximum cost to be paid for the completion. The Messer bid was for $6,650,000.00, for that which was contracted for with Oakridge plus necessary corrective work.

Despite the passage of much time, General has failed to make payment as contemplated by the bond after the cost of completion had been determined. Not only did it not express its willingness to pay the cost of completion up to the extent of the penal sum called for in the bond, but to the contra wrongfully denied its obligation to make any payment whatsoever.

That the failure of General to abide by its contractual obligations has increased the damage suffered by plaintiff occasioned by the default of Oakridge is beyond dispute. The Court finds that despite knowledge on behalf of General since at least June of 1973 that substantial sums of money were due and owing by Oakridge to subcontractors, material suppliers, and others in connection with the project, General has not paid these creditors under its labor and material payment bond. Its alleged justification for these failures may be summarized by its position that it was free of liability by virtue of alleged material breaches of the construction contract by Continental. This contention, as the Court has already stated, is without merit.

The notice of formal default by Oakridge and Crevolin was not one which should have come as a surprise to General as they had for some time prior thereto been on notice of the difficulties which were taking place on the project.

There is no doubt but that since the date of default damages to Continental have magnified.

For reasons which the Court will elaborate upon, General's argument that it can in no .event be found liable for a sum in excess of the penal sum of the bond is, by virtue of its own misconduct, not viable.

The terms of the performance bond were such as to obligate General to indemnify and save harmless Continental from all costs and damages by reason of Oakridge's default or failure to faithfully perform its contract. The limitation of $4,050,754 was the limit of its guarantee of Oakridge's obligation under the construction contract. That set of circumstances came about when, pursuant to Article 14, 14.2.1 of the general terms of the contract, the architect certified that sufficient cause existed to justify said certification. It was that action which triggered General's obligation to Continental.

■ General's response to the notification was a letter of July 26, 1973 which read in part, "a surety owes no more duty or obligation to an obligee than does the principal." Faithful performance by its principal, referred to in the bond, must by its very terms be read in the full context of the contract. Any default by the principal is spelled out in . the bond to be default *under the contract as defined therein*. The contractor having been found to be in default under the terms of the contract imposed upon General an obligation to do one of two things: (1) Within fifteen (15) days thereafter, take over and assume completion of the contract and thereby become entitled to payments, if any, of the balance of the contract price, in which event it could not reasonably be argued that the limit of its responsibility was up to $4,050,754, the penal sum of the bond, for the completion of the contract might well have exceeded that sum. See McWaters et al. v. United States, 272 F.2d 291 (10th Cir. 1959). General, however, did not choose to so do. Not having so done it was bound to

(2) within fifteen (15) days after the reasonable cost of completion had been determined, pay in cash a sum equal to that amount less the balance of the contract price including retained percentage.

■ As the Court has previously pointed out, the reasonable cost of completion utilizing the procedure called for in the bond was ultimately determined as of receipt of the bid from Messer and Sons. The fact that the procedures called for affirmative action on the part of the surety would, without more, lead the Court to reach the conclusion that damages against General ordinarily would run from such time as it would reasonably take to secure bids from at least three responsible contractors. However, the record is devoid of evidence in this regard.

■ The Court therefore has concluded that fairness requires that damages against General for its own breach be calculated from a period fifteen days subsequent to receipt of the Messer bid.

In light of the general rule that a surety may not be held liable in excess of the penal sum of the bond, see State ex rel. Mayle v. Aetna Casualty and Surety Co., 152 W.Va. 683, 166 S.E.2d 133 (1969), General's liability at the moment of Oakridge's default may well have been limited to $4,050,754. General, however, chose not to exercise its right under the bond and its failure, by whatever designation, negligence, bad faith, error in judgment, mistake of law, etc., constituted a breach of its obligation to Continental, the liability for which is limited only by the amount of damages sustained as a result thereof. The surety agreement entered into for the mutual benefit of General and Continental contains no limitation of liability for its own breach. The bond imports an unconditional obligation on General's part and they chose to fail to fulfill it. The evidence discloses a fair inference to be drawn therefrom that had General acted promptly as they were required to do, the damage sustained by Continental would not have exceeded the penal sum

of the bond. Such, however, is academic —"The moving finger writes, and having writ moves on."

As the Supreme Court of Virginia in an opinion by Mr. Justice Holt so aptly stated,

> Sureties for hire are not wards of court to be shielded from heedlessness or folly. They must abide by their contracts and pay everything which by fair intendment can be charged against them. They act, not to accommodate others, but to promote their own interests and are to be judged accordingly. C. S. Luck & Sons, Inc. v. Boatwright, 157 Va. 490, 162 S.E. 53, 54 (1932).

The bond, the conditions of which were breached by General, incorporated the contract of August 13, 1971 between Oakridge and Continental and made it a part thereof. It, General, was bound to know of the terms thereof, including Article 14, 14.2.1. The article spells out the procedures for termination of the contract by the owner. The breach is the more serious by virtue of General's knowledge even prior to the notice of default, that the work was not going as contemplated. Indeed for at least seven months prior to the notice General received correspondence from counsel for Continental relating to difficulties then occurring. General ignored the fact that its obligation was to Continental. The bond was secured for Continental's protection, not for Oakridge's. See State ex rel. Mayle v. Aetna Casualty & Surety Co., 152 W.Va. 683, 166 S.E.2d 133 (1969). Additionally, General knew that time of completion was of the essence of the contract.

■ General's argument to the contra notwithstanding, the Court's conclusion that liability against it extends in amounts beyond the penal sum of the bond is neither new or novel in the light of simple contract law. The law has consistently assessed damages against sureties who defaulted on the bonding contract. In most of the cases the default was in the nature of unjustly withholding payment after being notified of the principal's default, and interest which had accrued from the date of the surety's default has consistently been assessed. This even though the total amount exceeded the amount of the penalty of the bond. In the cases cited the assessment of interest was the appropriate measure of damages for such default. To limit the amount to interest accrued from the surety's default is to reach an overbroad assumption, for while interest is generally the appropriate measure of damages for failure to pay an amount due and owing, see 22 Am.Jur.2d, Damages, § 65, pp. 96–97, in not every instance will interest be adequate to compensate for the breach.

■ Additionally, there has evolved an exception to the general rule, which provides that where money was to be paid for a special or particular purpose which was known to the party agreeing to make the payment, damages directly and naturally resulting from the breach and obviously in the contemplation of the parties may be given without limitation, consistent with the damages proven. See also, 44 Am.Jur.2d, Insurance, § 1797, p. 717; Alliance Ins. Co. et al. v. Alper-Salvage Co., Inc., 19 F.2d 828, 831 (6th Cir. 1927); Miracle Mile Shopping Center v. National Union Indem. Co., 299 F.2d 780 (7th Cir. 1962).

In the instant case, General's obligation under the bond was undoubtedly related to the completion of the construction on the project, a fact known to all parties at the time the bonding contract was entered into. General always knew that delays in the completion of the project would result in increased construction costs, and other allied expenses including lost profits, all of which have directly and naturally resulted from the surety's failure to make payment when required under its own bond to so do. To contend that the well established principle that a surety's liability for its own default in failing to make payment when due may carry the total recovery over the penalty amount of the bond only where the appropriate measure of damage is interest on the original amount due is fallacious. The principle

is well established, as the Court has pointed out, in those cases in which interest has been assessed as well as in those cases where the surety itself completes the project at a cost in excess of the penal sum, that sureties are liable for the natural and foreseeable damages incurred by virtue of their own breach.

Bill Curphy Co. v. Elliott, 207 F.2d 103 (5th Cir. 1953) cited by General, is not in point, for there the damages incurred by the obligee were simply those caused by the principal's breach. The breach of the surety did not in any manner increase the damage to the obligee over and above that caused by the principal's breach. Additionally, the Court was dealing with Texas law as distinguished from the law in West Virginia, for in West Virginia a compensated surety, such as a surety company, is not looked upon with favor with respect to its liability. See Board of Commissioners v. Clemens, 85 W.Va. 11, 100 S.E. 680 (1919); E. g., Mills v. Indemnity Ins. Co., 114 W.Va. 263, 171 S.E. 532, 533 (1933). See also, Morris, Suretyship Law in West Virginia, 68 W.Va.L. Rev. 3, 9 (1965).

The deficiencies of Oakridge's performance were such as to prompt an agent of General to describe the job well before the formal default as "a mess." Six weeks prior to notice of default counsel for Continental wrote General asking it to look into the situation, because amongst other matters sub-contractors had informed the owner that either they had not been paid by Oakridge or checks given them by Oakridge had failed to clear through normal banking channels.

 The bond given by General was a form of a contract and is governed by principles of contract law. See Lawhead v. Doddridge County Bank, 119 W.Va. 467, 194 S.E. 79, 80 (1937). See also, Restatement of the Law, Security, § 88 (1941).

The enormity of the damages resulting to Continental by virtue of General's breach were foreseeable. General was fully cognizant of the deficiencies of Oakridge's work. It knew that the construction was being financed by interim financing, at a substantial cost, and that both interest rates and construction costs were escalating. Less than two weeks prior to the declaration of default at a meeting attended by a representative of General, Crevolin stated Oakridge was going to lose over one and one-half million dollars, but that Oakridge would pay the subcontractors everything then owed to them. There was knowledge of Oakridge's indebtedness.

Coupled with General's failure to abide by the terms of its agreement with Continental is its failure to obey an order of this Court issued by Judge Hall in the form of a preliminary mandatory injunction against Oakridge and General under date of January 22, 1974, directing that General, "comply with and perform its obligations under the performance bond which are required by reason of the default of Andrew J. Crevolin Company." General has noted an appeal of this Order, although no Stay appears to have been granted. General's ineffectual statement of July 26, 1973, to the effect that they could "take no unilateral action that would prejudice or jeopardize our principal's legal rights" (Px FF), at the very least lost whatever viability General ascribed to it upon the issuance of the order by Judge Hall. One year later as this memorandum is being written, so far as the Court is advised, no action has been taken by General to fulfill its contractual obligation.

The alleged defenses of Oakridge and Crevolin were apparently so specious that no representative of either even appeared at trial.

The evidence simply failed to disclose any justification for General's conduct. The Court could find no facts which would have warranted or justified Oakridge's default. If General chose as it did to adopt the position that there was no default under the terms of the agreement between Oakridge and Continental, it did so at its own risk and innocent parties under law must not suffer the consequences. General's conduct was tantamount to bad faith.

General contends even now that neither it nor its principal are responsible for certain corrective work required because of water damage. While the Court does not view General's position that design deficiencies are a valid defense available to either it or Oakridge, to the end that there be a specific finding in this regard, the Court concludes that such damage as occurred has been occasioned not by faulty design, but by virtue of Oakridge's abandonment of the project at a time prior to the sealing of the roof in a manner so as to keep rain water from leaking through. Additional water damage, as well, has occurred by virtue of construction failures on the part of Oakridge.

Coupled with the damage incurred in having to complete the construction is the further damage to Continental incurred in financing of the work already done. This expense, like the escalating constructions costs, was foreseeable. As of the date of trial Continental was paying an interest rate set at two percent above the Best Floating Rate of First National City Bank, New York, which was then 11½%, a sum equal to $53,674.02 per month.

Additional damage has resulted from the breach of both Oakridge on the construction contract and General on the bond from loss of profits, as well as the expense of maintaining the construction already completed, and certain other expenses incurred, some of which the Court deems properly chargeable against Crevolin and Oakridge but not General. The contract between Continental and Oakridge specified that for failure to complete on time the liquidated damages were to be computed at $1,333.33 for each calendar day in excess of allowable time for completion. Continental argues that as against Oakridge and its guarantor Crevolin, it is not limited to such sums as are called for pursuant to that provision of the contract. For reasons hereinafter discussed, the Court concurs. Additional sums are due as against Crevolin in accord with his "guaranty agreement" of December 27, 1971, wherein he warranted as follows: "—

that I will be personally responsible for payment of any and all costs therein which exceed $4,200,754.00, and that said costs will be paid promptly when due. 'Costs' includes delay costs and penalty provisions."

Continental claims other items of expense allegedly incurred in anticipation of the opening of the motel, for which the Court is not satisfied by a preponderance of the evidence are all appropriately attributable to all and in some instances to any of the defendants for reasons which will appear *infra*.

One further issue remains for consideration and that is General's assertion that the plaintiff failed to mitigate its damages. It must be borne in mind that the facts adduced show that Continental was capitalized with $10,000.00, which was its net worth. The sole purpose of the corporation was to build and operate the project giving rise to this litigation. All sums in addition to the capitalization were borrowed. The general rule enunciates a duty to mitigate damages. See Griffith v. Blackwater Boom & Lumber Co., 55 W. Va. 604, 48 S.E. 442 (1904). This rule, however, presupposes an ability to mitigate. In *Griffith, supra*, the West Virginia Court points out, however, that the principle is one of equity and common sense. The duty is to exercise all reasonable exertions to render the injury as light as possible.

Regardless of with whom the burden to show failure of mitigation rests, and the Court concludes it is on defendant, see Huntington Easy Payment Co. v. Parsons, 62 W.Va. 26, 57 S.E. 253, 255 (1907), this record is patently clear that so far as an ability to mitigate by the expenditure of monies on the part of Continental, it was devoid of same. Plaintiff was incapable of reasonably avoiding the principal losses resulting from the several breaches. See McCormick, Damages, § 38, at 141 (1935). In some instances where it could mitigate it did, as in winterizing the project to protect it and retaining security personnel and principals' sala-

ries. The Court is not satisfied but that with little effort and minimal expenditure this could have been greatly reduced or avoided.

It is obvious that to make the interest payments on the construction loan, which amount to $53,674.02 per month, Continental must depend on borrowed money.

■ Legal expenses and accounting are not proper items of damage for breach of contract as here. Claimed loss of value to carpeting, draperies, furniture and equipment have not been established to the Court's satisfaction, nor has the claim of interest due to United Realty Corporation. While the Court is satisfied of the fact that interest is due United, it is not satisfied of the precise expenditure giving rise to this and whether it is attributable to the conduct of the defendants.

Finally, as an element of damage, plaintiff claims loss of profits. The facts so far adduced in this regard lead the Court to the conclusion that plaintiff is entitled to lost profits against all defendants. However, it was understood and agreed to by all at trial that defendant General would be given an opportunity at a later stage to produce such evidence in reference to the amount to be awarded as it deemed appropriate, for consideration by the Court. Accordingly, the Court will withhold its finding as to the amount of lost profits to be assessed against General. The Court will as well withhold specifying the precise amount of damages for lost profits against the other defendants until it has the benefit of such evidence as General may tender.

All damages awarded and to be awarded were in the Court's view the natural, foreseeable and obvious result of the several breaches of contract.

## CONCLUSION

■ General is liable up to the penal sum of the bond for the breach of Oak-ridge, see State ex rel. Mayle v. Aetna Casualty and Surety Co., *supra*, 158 W. Va. 683, 166 S.E.2d 133 (1969), less charges for change order work and balance of contract price including retainage in the amount of $404,245.08. It must be kept in mind that at the time of Oakridge's breach, Oakridge was liable for the projected cost of completion of the project on that date, which cost was $6,650,000 less $605,150, representing the amount by which construction costs rose between June 1973 and January 1974. General's liability under the bond, however, did not accrue until January 1974. It therefore cannot be held liable for the $605,150 increase in cost of completion which had accrued from the date of the contractor's default. Therefore, by virtue of the contractor's default General is liable in the amount of $3,646,508.92, with interest thereon at 6% per annum from May 24, 1974.[3] For its own breach it is additionally liable for increases in cost of completion of the project resulting from said breach. In short, any increase over the $6,650,000 for which the project could have been completed at the date of its breach. This figure the Court finds to be $159,600, for which it is liable, with interest at 6% per annum from May 24, 1974.

The Court further finds the following additional damages to be assessable against General, all to bear interest at the rate of 6% thereon from this date:

A. Winterizing the project—$4,000.00

B. Cost of maintenance of security guards and facilities—$13,915.00

C. Interest money expended by Continental on construction loan at rate of $53,674.02 per month for the period between February 1, 1974, being a date fifteen days after ascertainment of cost of completion and the latest date to which General, under any theory, could have arguably withheld payment of cost of completion, and May 24, 1974, being the date of trial—$202,576.14.

---

3. Represents Bond amount less $404,245.08. See note 2, supra.

Oakridge's liability is not limited under the liquidated damage clause of its contract to $1,333.33 per day in excess of allowable time for completion. While the Court has found no cases in West Virginia in point, it is satisfied that in cases of abandonment as here, and as distinguished from mere delay in completion, the better and more equitable rule is that abandonment is a breach, voiding the liquidated damage clause. This is especially so where the abandonment results in actual damages far in excess of the liquidated amount called for under the contract. To do otherwise would be to award the wrongdoer. The liquidated damage clause was contemplated by the parties to cover normal delays. When Oakridge abandoned the project as it did, it repudiated the contract and actual damages may be recovered. See Moses v. Autuono, 56 Fla. 499, 47 So. 925 (1908). See also Murphy v. United States Fidelity & Guaranty Co., 100 App.Div. 93, 91 N.Y. S. 582 (N.Y.1905).

Oakridge, who like General was ordered by Judge Hall to fulfill its contract, is liable for all damages reasonably foreseeable as a consequence of its breach. Damages incurred in the warehousing of furniture, the cost of obtaining key personnel, and other expenses to be hereinafter referred to as the natural and foreseeable consequence of its breach.

As goes Oakridge's liability, so goes Crevolin's within specified limitations. He had agreed to be personally responsible for the payment of any and all costs in excess of $4,200,754.00, including whatever losses resulted from a delay in completing the project in accordance with the contract.

The Court finds Oakridge and Crevolin liable for the following items as respectively designated:

*Oakridge*—For the cost of completion of the project as of date of trial—$6,-809,600.00 [2] with interest at 6% per annum from May 24, 1974.

*Crevolin*—For the difference between cost of completion of the project as of date of trial and $4,200,754.00—$2,608,846.00, with interest thereon at 6% per annum from May 24, 1974.

Both Oakridge and Crevolin are additionally liable for the following:

| | To 4/30/74 |
|---|---|
| Warehousing of furniture, equipment, etc. | $ 8,312.87 |
| Billboard Advertising | 3,473.20 |
| Cost of Obtaining Key Personnel | 1,529.58 |
| Engineering & Consultant Fees | 62,702.01 |
| Winterizing Project | 4,000.00 |
| Sanitary Facility Maintenance & Security Guard Maintenance | 13,915.00 |
| Interest to Innkeepers Supply Co. | 16,924.25 |
| Interest to Budd Co. | 2,927.94 |

Interest money expended by Continental on construction loan at rate of $53,674.02 per month for the period between June 1, 1973 and May 24, 1974—$631,968.30.

Additionally, the Court reserves the right to assess further sums by way of lost profits.

A judgment order consistent with this memorandum will enter.